Our final case this morning is number 172172, Sears v. United States.  May it please the Court, Your Honor. This is an appeal by five Iowa farmers or farm families for the severance damages with respect to the crossing of their farms by a hiking and biking trail. I think I want to start with the proposition that there are and clearly were damages resulting from the severance of these agricultural parcels by the hiking and biking trail. The factual issue for the court to determine at trial was how to measure and how to calculate those damages and that is really the only issue on this appeal. The appraisers in the case were all instructed to do a before and after appraisal. The before is an appraisal of the entire larger parcel as if it's unencumbered in the before. The after appraisal is the appraisal of what's called the remainder and that's the larger parcel less the area where the hiking and biking trail is located. If there is a diminution in value between the before and after appraisal, that is the amount of severance damages. Your expert said that point rows have an effect on the end rows as they call them, the land that abuts up against the point rows. But he said precisely that it doesn't affect the rest of the land, right? No, I disagree completely with that, Your Honor. What he says is that the presence of point rows can be measured to determine the diminution in value of the entire remainder. He actually said it doesn't affect the whole farm, just that strip along through there, right? That's a quote. The point rows are next to the area of the tape. The point rows and the end rows, as you mentioned, Your Honor, do not affect the rest of the remainder. But the test is to determine the diminution in value of the entire remainder from having a severed farm. The whole concept of market value is the key. Does the market value depend on producing corn? Because I think there was a specific finding that there was no reduction in market value for producing soybean. That is one of the major mistakes that the trial court made, Your Honor. The fact of the matter is that the first mistake is a mistake of fact, where he created a fact that is nowhere in the record that the area impacted by point rows had a 45% diminution in value. He then applied that, however, to the area impacted by point rows. And that is, in essence, then a mistake of a mixed question of fact and law because the test is to try to determine the diminution in value of the entire remainder. And then the third mistake is... Well, so, assuming I want to buy a piece of property and I know that some of it is impacted, right? The question is, how do I get the most value out of the rest of the property? And are you saying that the entirety of the property is valueless? No, exactly the opposite, Your Honor. I'm saying that the remainder... Are you saying no one would have bought in the face of this right away? No, they would have purchased the remainder as is. You wouldn't purchase just the area impacted by point rows next to the hiking and biking trail. And so a willing buyer and a willing seller, which is the definition of market value, the test or the question is, is what a willing buyer would pay a willing seller now knowing that the farm is severed? And that has to be measured in the marketplace. And it is a question of market value. So in all the cases that have ever determined this, a willing buyer would not come and say, I'm going to purchase just the area impacted by point rows. And, in fact, the other mistake that the trial court made here is if you look at the... But you never presented a theory, for factual purposes, to the trial court saying that the mere fact that the property is severed in and of itself has a particular value reduction on the property, right? No, just the opposite, Your Honor. That was our expert testified at great length about that exact point. And his methodology determined the diminution in value for the entire remainder, not just the area impacted by point rows. And so he took the measurement, what he did, and his methodology has been used in a myriad of these rails-to-trails cases involving agricultural parcels for decades. He has actually appraised over a million acres of agricultural land. And what he does is he takes paired sales, where you eliminate everything except the shape adjustment. So you have rectangular or square parcels, and you compare them through a variety of paired sales to see what the diminution in value is on a per acre basis for the remainder. So, in that case, what he does is he takes an area of measurement and sees how much area is impacted by the point rows and compares that to the after sales or the sales of the remainder to determine the diminution in value on a per acre basis. That is the whole point. The entire exercise was to demonstrate that there is a diminution in value to the entire remainder. How do you calculate? There seems to be a bit of a dispute here about whether it's 1% per linear foot, which, as I understand it, you've disclaimed as the methodology. What is the methodology that you think ought to be applied? I think, as our expert testified, Your Honor, it should be a one-to-one ratio. What does that mean? It means for every percentage of acres impacted by the point rows, the price per acre for the entire remainder is deducted by 1% or is reduced by 1%. That's what all the myriad of paired sales show. It doesn't seem to me to make a lot of sense. I guess that was the problem that the claims court had. I think it makes perfect sense, Your Honor, because what it's doing is compiling all the paired sales to see how they relate to one another. The government's experts did not agree with that proposition, right? They did not agree with that. That's a flawed analysis. So why can't the claims court rely on the government's experts and find them more credible than your expert, no matter how many times your expert has testified? That's the interesting point, Your Honor, is that the trial court actually took the government's evidence, which was actually evidence of what I'll call consequential damages. It was the increased costs associated with the production. It was the loss of a corn yield or volume, a potential loss of a soybean volume. Those are consequential damages which are not collectible and should not, frankly, even have been admitted. And we objected to them at the time. And so, in fact, I think the leading case on that is actually a case from this court, the Georgia-Pacific case that's cited in our brief, where in footnotes 43 and 44 of that case, the court specifically held that consequential damages of that type are not recoverable. Wait, but even if they're not independently recoverable, they are additional costs that are then baked in to a willing buyer's assessment of what the value of the property is, right? So they're not irrelevant. They're potentially not irrelevant. Well, they're not irrelevant on the issue of the additional costs. A willing buyer would come and say, what am I going to pay for the entire remainder, not how much increased costs I'm going to have. I mean, you know, if I buy a house and it is a mess and needs to be completely renovated or there's a whole section of it that was flooded and I know that's going to have to be rebuilt, why is the rebuilding of that section not a factor and the cost of doing so not a factor that I would take into account in my purchasing decision? I think you can take it into account in your purchasing, but that's not the test. The legal test is how much a willing buyer will pay for the totality. And it's not just the costs that are demonstrated in the market. What you have here, essentially, is a parcel that's rectangular attached to a parcel that's triangular, as I understand it. And that the point row problem affects the triangular part of the parcel and doesn't affect the rectangular part of the parcel. And then what you're doing is you're making a diminution in value of the combination that treats the rectangular parcel as having zero value or less than zero value. In other words, a farmer who has a point row problem can say, well, I'm not even going to bother to farm the triangular part because of the point row problems. I'm just going to farm the rectangular portion. There are no extra costs imposed on him for farming the rectangular portion because it also happens to be attached to a triangular portion. Is that right? I don't believe so, Your Honor. First of all, there is no rectangular portion in the after. There are two triangular portions because when a hiking and biking trail crosses a rectangular field at an angle, this is the whole point of trying to measure the diminution in value. You then create two triangular sections out of what was before a rectangular piece of ground. And the test is, as well established in the law, not what the consequential damages are or not what the increased costs are. The test is very simple. What would a willing buyer pay for the totality of the remainder? And that has to be measured in the marketplace. Well, I'm really confused by your answer because I thought it was agreed that there were parts of this land which were not affected by the point row problem. Now you seem to be telling me that everything was affected by the point row problem. What I'm trying to say, Your Honor, is the entire remainder is impacted from a market value standpoint by the existence of point rows. Well, if point rows affects the whole property in the way it's farmed, that would seem to be correct. But I thought that the Board of Federal Claims had made a determination that a significant part of the property wasn't affected by the point row problem. I think that's what he tried to measure through the use of these consequential damages. And he ignored... Well, first of all, he actually created a fact by coming up with a 45% diminution in the value of the land. So what he did was he took the increased costs associated with farming the point rows... The diminution not of the entire land, but just the part that was affected by the point row problem. Correct, Your Honor. That fact, a 45% diminution in land value, first of all, is not related to the consequential damages at all. There is no evidence whatsoever that an increased cost of farming a particular acre reduces the land value by any percentage. No expert testified to that. There is no evidence in the record anywhere. So what he did was he created a fact at a 45% diminution, applied it not to the entire remainder, as he was required to do under the before and after analysis, and applied it just to the area impacted by point rows. And ultimately then, concluded that that was the total severance damages, but did not calculate and did not even attempt to calculate the actual diminution in value of the entire remainder that was demonstrated by all the paired sales that were utilized. And in this instance, the severance damages are... I believe the judge got it right before he got it wrong, because he used a ratio within the testimony of doing this for decades, and then he created a fact that was outside that range and applied it only to the area impacted by point rows. So I believe there was a mistake of fact, there's a mistake of a mixed question of fact and law, and there's also a mistake of law. Okay. All right. Thank you for the rest of your rebuttal here. Ms. Peterson. May it please the court. There was no abuse of discretion in the... Is it true that the parcel here is composed of two triangular portions? There are five parcel clusters at issue here, and I personally have to admit I do not know the geography of each of these, but if my opponent's concern is that the detriment was applied only to a part, and it was applied to the point row part, I think he agrees that the point row areas are not the entire remainder. So let me go back to my house hypothetical, okay? So you've got a home that has a particular appraised market value, and a portion of it is destroyed. And you go in and you say, now what's the actual market value of the home in its entirety? Are you saying that the only market value, the only way you would figure that market value is how much would it take to fix the part that's destroyed? No, not at all, Your Honor. Let me just explain what... So the entirety of the parcel is impacted by the right-of-way, right? Correct. So how can you say that the only thing we'll look at is the portion that is not as operable for purposes of farming, and that there's not an overall market value that has to be taken into account? Well, the reason the United States experts concluded that there was no market value difference for the entire properties is that one could not be discerned by any statistical or paired sales analysis. Isn't your argument that unlike Judge O'Malley's hypothetical, what we're dealing with here is not a single house, but two separate houses, and one house is not affected by the damage, and its market value isn't affected by the damage, and the only damage that should result in a reduction is with respect to the second house, which was, in fact, damaged? That is correct. I'm not sure that it's a perfect analogy, though, here, Your Honor, because here the only rule of law here is that the plaintiffs are entitled to which includes both the land actually taken by the trail and any diminution in the value of the remaining land. Using comprehensive sets of data and numerous different analyses, the United States experts were unable to discern any regular mutinized difference in market value. They determined that it was extremely minimal. They thought it was minimal. The claims court didn't adopt that, didn't buy it. Correct, Your Honor. The claims court did not adopt either side's valuation. It instead determined that there is a systematic difference in the market value of properties affected by point growth, but that it is so tiny that it cannot be established using statistical methodologies. And it, therefore, developed a method to determine how much a willing buyer would be likely to discount the price he was willing to pay for this property because of the presence of the point growth. But the market value, I mean, I happen to know a lot of farmers, and they want to be able to farm as much area as they can. There's no question they can farm every acre of these parcel clusters. Not easily. All of the experts agreed that the difference is in the efficiency and that turning large mechanized equipment on sharper angles results in some inefficiencies and additional costs. So a lot of farmers wouldn't want to buy that property, right? But the market data does not show that they, therefore, pay less for properties with point growth. You're not arguing that we should go back and adopt your original position. You're trying to defend the position taken by the Court of Federal Claims, which is that the part affected by the point growth would be reduced by 45%, right? Correct. And that was the Court of Federal Claims' effort to best approximate what the actual market difference is between the price a willing buyer would pay for a purely rectangular field clusters and clusters that include point growth. And the difference is because of those inefficiencies, and, therefore, he computed it using some information from costs attributable to the double planting and lost productivity of those areas where the mechanized equipment would be less efficiently operated. That is similar, in fact, to the severance damages that were computed in the Georgia-Pacific case, which, by the way, says that any number of different means can be employed to measure severance damages. There is no rule of law that says you have to measure severance damages in any particular way. You merely need to compensate the owner for the reduced value of the remainder in addition to paying compensation for the land actually taken. And so are there other cases pending that involve this point growth problem, or is this unique? This is not unique, Your Honor. These trails in Iowa are being litigated in numerous cases, I believe, and the plaintiffs frequently attempt to value severance damages as greatly impacted by point growth. But, in fact, there's no evidence that buyers are. But there is evidence. Matthews says that there is evidence, based on his analysis, that actually the market treats point growth, even if you could do something with them, as creating a negative value for the land itself. He didn't say that. He did not say that, and that is not correct. These fields have had point growth on them in the past, because this easement has been present across them for many years. All of these acres have been farmed. The historical record shows that productivity is less efficient, is reduced to some degree in these areas, but they are not useless for farming. They are farmed. I'm not saying what the productivity evidence shows. I'm saying that you said there's absolutely no evidence, and Matthews has testimony that says there is evidence that a willing farm buyer views point growth as creating negative value. His testimony is based on- You may not agree with his testimony. But it doesn't say that. But to say that there is no evidence. It doesn't say that. His testimony is that using his paired sales analysis, correcting for what he considers to be all of the other factors that might influence price, he determined that point growths affect prices in a range of amounts. And from those, he picked a ratio that he thought would be reflective. The United States experts used all the sales that were conducted within 18 months of the taking here in the two counties where these agricultural properties are located, and rigorously analyzed them using both paired sales and regression analysis, and found no systematic influence from the presence of point growths. So it may be that there is an influence, but Mr. Matthews did not necessarily find one. He just assumed one. He corrected for all kinds of other important aspects of agricultural property pricing. Is there a legal question involved in this case, or is it just are we dealing with a situation where there might be different methodologies to calculate the amount of damage that was within the discretion of the claims court to adopt the method that it did? No latter, Your Honor. This is a run-of-the-mill valuation case. There is no, and plaintiffs have not cited a single case that says there's an entire remainder rule. And in any event, what the Court of Federal Claims attempted to do here was to determine the diminution in value of the entire remainder by computing the difference in the areas that were actually affected. The impairment does not affect areas that are not in point growths. Therefore, its detriment did not apply to those areas. And by the way, its 45% point growth detriment was based on evidence in the record that the productivity for corn in these areas is reduced by 52%. It also took into account that both, two things, that Mr. Matthews' results were wide-ranging and that applying his one-to-one ratio would effectively diminish the value of the remainder to less than zero, which is both violative of the legal principle that all land has value and unsupported by the historical record here. So there's no question that the district court acted within its discretion in computing the severance damages in this case. Okay. Thank you, Matthews. Mr. Stewart. Thank you, Your Honor. May it please the Court. A number of quick comments if I might. Counsel for the government first said that we didn't cite any case about an entire remainder rule. That rule started in 1897 in the famous Balman v. Ross case that's cited in our brief. It has been continued to this day, and it's been actually affirmed by this court on a number of occasions. The only other case that has come to this court's attention with respect to Point Rose was actually a case, three cases consolidated, the Rasmussen, Jenkins, and Adkins case that came to this court three years ago where Point Rose also existed, and Point Rose were determined. That particular case, the government appealed the reclamation costs and not the Point Rose. And so this is actually the first time, it's not the first case where Point Rose had been determined in this fashion, but it's the first time that the issue of Point Rose has come to this court. The other thing that the government – You say that he's used this methodology for, what did you say, thousands of cases? Decades, Your Honor. So has our court ever accepted his particular methodology? No, that's what I tried to say, Your Honor, is that it was tried in those three cases that were consolidated for trial, but when it came here, the government did not appeal that result. And so the court did not have to address the issue of Point Rose damages in the combined cases of Rasmussen, Jenkins, and Adkins because the only issue that the government appealed in that case was the reclamation cost issue. Well, we can't assume that means anything, right? Just because the government didn't do it, maybe they decided they should have. I think that's exactly – they later determined that maybe they should, even though the trial court in that time utilized Mr. Matthews' methodology as they're doing here. Now, the other example – Mr. Matthews did concede on cross-examination that, you know, if you tweak any of his assumptions, it could change the result, right? I think that's right, and I think that's why there's a range between 0.6% and 2%. And over the years and over the decades, that's why he's landed on one-to-one as being the most logical relationship. The government, I don't believe, frankly, to this day understands it. If you look at their brief, for example, they talked about some percentages that weren't included anywhere in the record. They talked about percentage decline for linear feet, which is not correct. And I think that the fact of the matter is that Mr. Matthews' calculation is designed to determine the diminution in value to the entire remainder as opposed to just the area impacted by point rows, which is the test, I believe, the Supreme Court adopted back in 1897 and has applied ever since. Okay, Mr. Stewart, thank you. I think we're out of time. Thank you. That concludes our session for this morning.